Wait and let everyone get settled. Good morning, my name is Todd Crawford, I represent Marquette Transportation in connection with this matter. This is principally an appeal of the damages award made by the district court. I think it's important at the outset for the court to understand that the plaintiff elected in his case in chief not to present any evidence of the repair cost to the damage to his property. He relied solely for his damages on the testimony of his, what I will call his litigation support expert, which is a gentleman named Kyle Smith. Mr. Smith opined that the Aquata, which is the name of the vessel, was worth between $850,000 and $1.5 million. The trial court rejected Mr. Smith's opinion, finding it not credible and not supported. So in the end, the evidence that the plaintiff actually presented did not carry any burden as far as the court is concerned. Now the first error I want to talk about is the court awarded, the court found that the Aquata was a constructive total loss, even though the only evidence in the record of repair costs was less than the value assigned to the boat by the judge. The definition of a constructive total loss is, by definition, the repair costs are greater than the value of the boat. The judge found the value of the boat was $417,000. The only evidence in the record of repair costs comes from the plaintiff's other expert, Larry Strauss, the first expert that he retained to go out and look at the Aquata in June of the incident. Mr. Strauss said that his best estimate of the cost to repair the vessel was $285,000. He very specifically said it could be more, it could be less. Now you can search long and high in the record, that is the only evidence of the cost to repair the Aquata that is in the record. Now that testimony comes from the plaintiff's own expert, Mr. Strauss. He was retained for that specific purpose, and that's what he opined on. Now significantly, on rebuttal, plaintiff didn't come back and say, oh, no, but there were more repair costs that we haven't addressed, let me show you that evidence. So in the end, absolutely without question, the Court's initial finding that this was a constructive total loss because the value of the vessel, excuse me, because the repair costs exceeded the cost of the vessel is simply not supported based upon the Court's findings because the Court said that it was $417,000, the vessel was worth that. What evidence, excuse me for interrupting you, but this, of course, case is a puzzle. What evidence is there about the value of the vessel? I mean, he purchased this vessel, I guess this is an arm's length transaction three years earlier. He bought the vessel for $200,000. His testimony is that he had purchased the vessel previously, I want to say like in 2006, for $200,000. That is what his testimony is. Supposedly, it's an arm's length transaction, at least there's nothing in this record that suggests there was anything odd about the purchase, right, except you'd wonder, having read what I've read, why anyone would have done that, but there's a, I take it there's no question here that that was an arm's length transaction. Your Honor, I will tell you that that was not litigated in the Court below. I don't think that there's a lot of evidence corroborating that. All right. So we have a willing buyer and a willing seller, hypothetically, and he paid $200,000 for the vessel. Well, I guess in the end, what we're really talking about, and I'll get back to your question, okay, let's say he paid $200,000 for the vessel, and the Court, let me back up, we sent very basic interrogatories. I don't think you can get any more basic.  What was it worth? I mean, literally, it might have been a little lawyer-fied, but that was basically the question, okay? And the answer comes back, I don't know, only an expert can say. That's the answer to both questions, okay? So when I ask the plaintiff, tell me what your boat was worth, his answer is, the only person that can say this is an expert. So that's why I take issue when the trial court starts taking all of the little individual pieces of the plaintiff's testimony and says, well, he paid this for it, he says he invested this for it, he says he paid laborers this much for it, so I'm going to take all this and cobble it together and come up with a value. And the reason I have to take issue with it is because the plaintiff himself, in his discovery, knowing all of that information, chose to limit the evidence that could be considered on that issue to expert testimony. Then the expert that he retained to come opine on that, the court rejected. But just on this first point, before I move on, no matter what, the court says it's worth $417,000. You get the lesser of repair costs or the value at the time of the incident. The repair cost is $285,000. So without question, it has to be reversed on that basis. The next issue, though, that I want to talk about, and before I leave that, probably the opponents will come up and say, well, Strauss didn't consider everything, he didn't dry dock the vessel. There were some other damages maybe that he could have seen if he'd done all of that. I want you to know, number one, when he bought the boat, he didn't dry dock the boat. Mr. Munch did not dry dock the boat when he bought it. It had never been dry docked. It had never been seen. Strauss told him, if you want me to look underneath, we've got to go dry dock this boat. Munch chose not to dry dock the boat. So what we basically have is the judge saying, well, I'm going to assume there are more damages than just dry docking the boat, but no matter what, there's no value associated with these unseen damages. There's no evidence in the record that would say this is how much those damages were. And when they're criticizing what Strauss said insofar as what the repair costs are concerned, I think we're missing the overarching point, and that is, very early on, he realizes this boat is not worth nearly what it would cost to repair this boat. Okay, so he says, Strauss says it's worth, or the cost of repair is $285,000. In Strauss's opinion, now remember, this is the plaintiff's expert. We did not hire this man. He was hired by Munch within a month of the incident. He tells Munch, I think it's worth probably $120,000. So Strauss knows immediately this is a constructive total loss. Why? Because he says it's worth $120,000 and the cost of repair is $285,000. So he's like, look, why do we want to spend a lot of money fine-tuning whether it's $275,000 or $295,000 if we know it's only worth $120,000, according to Strauss? So the second, I think, more significant issue, though, is the judge refused to let me get that opinion from Strauss into evidence. And the basis for his denial was to say, well, it's not in Strauss's report. And so I'm not going to let you go into that because it's not in Strauss's report. Well, there are a couple of fundamental issues. The first one is, is Strauss is not Marquette's expert. It's true after we took his deposition and he disclosed that his opinion on the value of the Aquata was $120,000, it's true that at that point we also listed him as an expert to ensure that we had the opportunity to present that evidence at trial. But listing him as somebody that we may call as an expert doesn't magically transform him from the person that was retained by the plaintiff to somebody who's retained by Marquette. Now district courts have wide discretion to control questioning of witnesses. And with experts, it's commonplace to limit their testimony to the subjects on which they report. So what, where precisely, you're saying that rule doesn't apply if it's not your expert, that you can start asking him about anything? I would, absolutely, I would absolutely say that, Judge Costa. And the reason— And what case says that? Well, let me explain why I say that. Tell me what case says that first. I don't have a case for that proposition. But I'll tell you why. If you're going to tell me that all you have to do to prevent me from talking to you about this, I'm sorry, defense counsel, you can't talk about the normal MRI, you can't talk about the normal CT scan, you can't talk about the normal EMG scan test, because we got Dr. Smith to omit those things from his report. No, but if the topic is the patient's health condition, that's all relevant and he's opined on that in his report. Certainly you can cross-examine on anything relevant to the person's health. But if you, certainly you'd agree if you have a medical expert up there, you can't start talking about the amount of what a vessel's worth. Well, except that they designated him as an expert, as a certified marine appraiser. That's what they certified him as in their designation. He is a certified marine appraiser. For the value of the vessel. Well, what else would he be appraising? He is— But you're wanting to talk to him about the value of— I am wanting to talk to him about the value of the vessel. But importantly, the plaintiff — the whole reason that you exclude and you limit people to Rule 20 — to what's in the content of the report is to avoid surprise and prejudice. Strauss told Mr. Munch, this is my opinion in June of 2011. Strauss testified, Munch told me, do not include this in your report. I don't want it in my report. So respectfully, Judge Costa, when somebody tells you, I don't like that opinion, don't put it in your report, I'm going to turn around then and pretend that you can't ask somebody that. Now, let me also tell you this— Every civil trial I presided over, there always are these little fights about, is it in the report? Is it beyond the topics in the report? Every civil case has it. It's endemic. Lawyers love objecting on that stuff. And district judges have to draw a fine line because you're right, you're entitled to cross-examine the person on adverse evidence. But what's the standard of review that applies to him limiting those questions? Well, I absolutely think that's de novo because that's a legal question. I do not— Isn't it just an exercise of the Court's discretion? Wouldn't it be abuse of discretion? No, sir, because — and the reason I don't believe that is because the plaintiff, although he actually retained Strauss and sent him out to the scene to do his investigation and provide these opinions, the plaintiff himself designated him as a non-retained expert. That's what the plaintiff designated him as. So when the plaintiff says, I'm going to designate him as a non-retained expert under Rule 26, there's no report required at all. But beyond that, in his designation, he said, he, the plaintiff, Munch, said not only will he testify about his report, he will also testify about opinions described during his deposition. So he, the plaintiff, identified the scope that he would solicit testimony on. What happened is I then turned around and was soliciting testimony from that witness from his deposition. Now, here's the fundamental problem. This is not my expert. I can't go to him and say, will you please issue a supplemental report and put in it what your opinion is on the value of this vessel. I can't ethically go and say, hey, my opponent's expert, who I took a formal deposition of so I could find out what you have to say about this issue, would you please come tell me — would you please write a supplemental report? I'm not at liberty to go do that. So let me — let me just back up there. Now, this judge then not only, okay, prevented me from soliciting testimony from Straus that the boat was worth only $120,000, he then turned around and said, in fact, your handling of the case was so offensive, I'm going to cast you in judgment for attorney's fees to the tune of close to $300,000. Now, listen, you can tell me you think it's harmless error. You can tell me you think this is within the discretion of the judge to control. But certainly when Marquette is going into the handling of this case, it's free to think, okay, the only evidence of repair costs is $285,000. That's going to place an absolute limit. If the judge bites off on Kyle Smith's opinion that this thing is worth somewhere between $850,000 and $1 million, $285,000 is the maximum possible recovery. Isn't that part of why he imposed those attorney's fees? Because the experts you retained were sloppy, including relying on a source that they thought was this vessel but was for another vessel? Your Honor, I mean, listen, if you're going to condemn me because my experts were off, my experts were closer than his expert, Kyle — Kyle Smith. I'm not talking about the ultimate opinion. Excuse me, Mr. Crawford, the second time you've told the court to listen, you don't tell us to listen. Is that clear? Yes, sir. I apologize. Thank you. Sometimes I get passionate in this, Your Honor, and I, you know, I get a little overzealous. I do apologize for that. But you concede your expert was looking at the wrong — relying on a report for a different vessel. He did initially. That's true. He did correct that, however. He had the opportunity and did, and said it didn't make any difference in his opinion. The point I was trying to make, though, is that Kyle Smith's opinion, even if he used the lowest value possible, was off more dollar-wise than our experts' reports were. And if you use the higher version of $1.5 million, it's about four times what the judge ultimately found it was worth. I see my time is gone. I did reserve some time. Thank you, Mr. Crawford. Thank you, Mr. Crawford. Good morning, Your Honors, Chip Schomberger on behalf of the plaintiffs. I think it's important — well, let me start by just telling you that I'll be discussing the damages issue first, and then I'll get into Straus and then the attorney's fees. I think it's important to clarify the nature of Marquette's argument on damages. The district court didn't misinterpret or misapply the law of damages. The court and the parties all along have always agreed that a total loss results anytime that the property is either unrepairable or the cost of repairs exceeds the value, and that's exactly the law that the court applied here. What it did was it made a finding of fact that the cost of repairs indeed did exceed the value of the property. So Marquette isn't making a legal argument here. They're challenging a factual interpretation by the district court. And as Your Honors know, that's reviewed under clear error where the district court is entitled to any plausible view of the evidence as long as the record supports it. So in other words, that finding of fact is only reversible if it's implausible on the record and this court is left with a firm conviction that there's a factual mistake in there. Did your client, why, does the record show why your client bought this thing to begin with? I mean, there are pictures of it. Certainly. You know, Mr. Munch testified that he intended it to be his second home, that there may be some commercial use after that, but he really wanted to renovate it to be a pleasure vessel. And he did, he paid $200,000 for the hull itself. But just to back up, as to the evidence that supports the court's finding here, on valuation, we know under the Greer case that the district court is entitled to consider any and all evidence that it deems appropriate to come to a fair valuation of the vessel. And, in fact, in that case, which we cited in the brief, the court applied a similar formula. It was purchase price plus the value of improvements. So we have evidence in the record here that supports that analysis. We have a purchase price. Is it the value of the improvements or the cost? Because what's not clear here at all, to me anyway, is value. Well, I think Greer, the testimony in Greer was the cost of improvement. Yeah, it was cost. Certainly, yes. And, in our case, we have a purchase price of $200,000, and it's important to note that that was just for a bare naked hull. We also have testimony that there was $217,000 in equipment and materials that were used to improve the vessel, which is supported by other documentary evidence that was admitted without objection, and that is an itemized list of all the equipment and the value of each list. That was in specific response to Marquette's question about value of the materials and equipment installed on and used to improve the vessel, as well as bank records of those expenditures. But what we don't know is that after he paid $200,000 for it, and then he added another $200,000 plus by way of things onto it, that that increased the value of the vessel. Well, I think that's a factual determination for the district court. I mean, certainly the value of all of that equipment, the itemized list that was admitted into evidence was, as I said, specifically in response to Marquette's question about the value of that equipment. So there is a value correlation there, and I think the district court was within . . . Well, that's what you have to buy. You have to buy that he put $200,000 in it to buy it, and then he spent more than $200,000 or I've forgotten what the exact amount was, to fix it up, and that that is somehow value of the vessel before the elision. And that's a factual determination within the district court's discretion, and that's exactly what happened in Greer. That was a purchase price plus cost of improvement, and that resulted in a value determination by the district court. It was upheld by the Fifth Circuit later on. So was that finding specific here in the way that Judge King has described it? Yes. On the value? There was a valuation finding of $417,000 specific to the purchase price plus the cost of improvement. Yeah, and that's the question. You know, he paid $200,000 and he added all this stuff to it, and that, we are told, is the value of the vessel. Could be or it could not be. And again, that's a discretionary finding. The evidence certainly is there as to both of those components, and the court was within its power to make a valuation determination based on that evidence. As to repair costs, it's true that Strauss testified that it would cost $285,000 in repair costs, but what's also important is that that was with respect to just the hull. It didn't include any of the equipment or materials that were installed to improve the vessel. Most importantly, the two Volvo engines that alone were worth $70,000, and in fact the district court found that there was $123,000 worth of equipment and materials installed to improve this vessel that were lost as a result of this accident. So when you combine the $285,000 with the $123,000, you get over $400,000 in repair and replacement costs, and that's sufficient to sustain the court's finding that this is a constructive total loss. So moving on to the Strauss argument now, I have to say that when I was preparing for the argument based on the briefs, it was a little difficult to tell which arguments are still at play and which arguments are now either conceded or abandoned because Marquette made two factual arguments as to Strauss and why he should be considered a non-retained witness. They said first, we didn't designate him that way, and second, we didn't hire or pay him, and they provided no legal authority for that proposition, but we pointed out in our answer brief that the record proves, based on their designation, that they actually did designate him as a retained expert, and that Rule 26 doesn't turn on who hired and paid him. And in the reply brief, we got no response to those arguments at all. But more importantly, the factual basis for those arguments isn't even correct. We know that they argue in their brief that this was Munch's expert, and they only called him at trial under cross-examination. And we also know that they did indeed designate him as a retained expert. But at trial, Marquette's counsel clarified, and this is at page 444, that we'll tender him as an expert in the field of marine surveying and appraisal, and then he'll cross him on the experience, and so forth, during his cross-examination. So the only two factual basis for Marquette's arguments aren't even accurate. And I'll just touch for a minute on the attorney's fees, and all along from the inception of this case, Marquette considered this to be a total constructive loss case. And they knew that because of that, that fair market value was going to be at the heart of the case. And the district court found that the fair market value evidence that Marquette put forth was so lacking in any factual or rational basis as to be offensive to the court. The court used the word offensive, which I personally don't see very often. Offensive to the court and offensive to the parties. And this goes beyond just experts disagreeing. This goes to the core of matters within Marquette's control as to its own fair market value evidence. For two years, they put forth, relied on, and endorsed reports, as Judge Costa pointed out, that referred to the wrong vessel, the wrong dimensions, the wrong type of vessel. They also hired these two experts to opine on valuation, and they never gave them any information about the purchase price, gave them no photographs of the vessel before the elision to make that determination. The experts also didn't do any research to support their decision. I think Bright testified that he simply just came up with it. These were all matters that were clear on the face of the reports throughout the entire litigation, and the court found that to have no basis in rational thought or fact and therefore found inferred that that type of recklessness is tantamount to bad faith, and that's the basis for the award. So we'll ask that the court affirm it in all respects. All right. Thank you, Mr. Schoenberger. Mr. Crawford, you've saved time for rebuttal. Let me start with the last part first, if I could. One of the things that the plaintiffs had actually argued in their post-trial brief was to suggest settlement positions of the parties, and the court in its original opinion actually cited to those references. And then when we filed a motion for a new trial and pointed out that it was improper for him to consider the settlement positions of the parties, the court basically wrote the same opinion but just deleted that one reference. There's really no other finding that supports a finding of, quote-unquote, bad faith. But let me just tell you this. The argument was that we litigated this to the point of the plaintiff's insolvency. And what I think is interesting on that point is, is I told you I asked two questions. I asked a few more, but what's the cost of repair? What's the value of your boat? I don't know. I don't know. We don't get an answer to what the value of the boat was until two full years after the accident. Okay? He doesn't even tell us until June of 2013, June of 2013, on the eve of his expert designation deadline. Now, I took one deposition in this case. I took the deposition of Larry Strauss. And the reason I took the deposition of Larry Strauss is because I knew Strauss was not going to support the opinions provided by Cal Smith, the litigation support expert. And, of course, he did not. He said, no, it's worth $120,000, and I told him as much. And then we went through chapter and verse with all of the different boats that Smith listed in his report, and we said, look, are these comparable to the Iguana? And he goes, no. Are these comparable to the Iguana? And he says, no. And he does that over and over and over again. So what we did with Strauss was to demonstrate that the other expert, plaintiff's other expert, could not be relied upon to be accurate. So what you have, then, is you had a cap somewhere between our expert's opinions of $50,000 and Strauss's opinion of $150,000, where the case should resolve. And we tried to do that, and we invited the plaintiffs to go to a summit conference, and they refused to do that. And so what's interesting is, they're telling us that we litigated the case in bad faith, when in fact, even knowing that their repair cost was $285,000, their last demand to us was $675,000. So the maximum... ...bad faith findings related to attorney's fees in the revised order, which didn't include this settlement stuff you're talking about, the judge, first of all, cited this business with the experts we've already talked about, but then he said you contested liability even though you had no good faith basis for doing so, as it was this elision, and it was your barge. What's your — what was your basis for contesting liability? Well, I'll tell you twofold, and I'll go through that briefly. It's not briefed, but the accident doesn't actually happen immediately, but this guy — the captain had been ordered to stop in the river and hold place, okay? So he went forward 1,000 feet, allowed the river to push him back down. Vessel traffic ordered him to stop. He repeats this for about an hour, successfully, on — obviously, the last time, because of the time it happened. He goes up just slightly further than he had beforehand, he catches an eddy, and it pushes his whole barge towards the bank where the accident happened. He does it — he first sees — he shines his light, he sees it. For the first time, what he does is he lands ahead of the barge, and he holds off for like 30 minutes. And he calls the fleet boat from Basin and says, Basin, come help me, I'm in trouble. And he waits 30 minutes. Now, he's holding it off successfully for 30 minutes. He doesn't have the elision initially. And the fleet boat never comes and helps him. Secondly, Basin, who was sued by the plaintiff, not by Marquette, Basin wasn't authorized to have this type of vessel in that location. And third, Basin didn't put their — didn't put this boat in the protected position where it put its own boat. See, it put it outboard, furthest out, so that if there is an elision, it's going to be hit, versus if you have a steel barge. We could have hit a steel barge all day long and done little or no damage, versus you put a fiberglass boat on the outside like Basin did, and you're going to crunch it. And the district court agreed with us when it denied summary judgment for Basin. So certainly there's a good-faith basis. But let me point out, we didn't sue Basin. We didn't even cross-claim Basin. He's the one who sued Basin. In fact, he appealed the district court's dismissal of Basin. So, you know, if you want to talk about what — somebody who's in bad faith, certainly — you know, on those issues, Judge Costa, we were sued for punitive damages, okay? I certainly don't think that you would expect me to stipulate to liability when I've been sued for punitive damages. We were also sued for loss of business revenue, even though this boat had never operated under its own mode of power and never earned any money. I see my time is gone, but that's my answer for your question. All right. Thank you, Mr. Chairman. And I do apologize again.